FILED
2011 Aug-01  PM 03:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **DEBORAH O. BUFORD**, | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) **CV-10-BE-02966-E** |
| | ) |
| **MICHAEL J. ASTRUE**, | ) |
| **Commissioner of the Social**, | ) |
| **Security Administration** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM OPINION

### I. INTRODUCTION

On June 4, 2008, the claimant, Deborah Buford, filed a Title II application for disability insurance benefits ("DIB") and a Title XVI application for supplemental security income ("SSI") benefits under the Social Security Act. In both applications, the claimant initially asserted that her disability began on May 1, 2000. The Commissioner denied both claims on July 24, 2008. The claimant timely requested a hearing before an Administrative Law Judge and appeared with counsel at the hearing on August 17, 2009. (R. 39). A vocational expert also appeared at the hearing and presented testimony. (R. 39, 43). At the hearing, the claimant amended the alleged onset date to November 6, 2008 to conform with medical records in evidence. (R. 18-20, 39). Because she was last insured for Title II benefits on June 30, 2006, the claimant voluntarily withdrew her request for a hearing regarding her Title II application. (R. 20, 39, 167).

In a decision dated October 22, 2009, the ALJ dismissed the Title II hearing request, leaving the previous denial of DIB in effect. (R. 39).  As to the Title XVI claim, the ALJ found that the

1

claimant had not been under a disability as defined by the Social Security Act and, therefore, that she was ineligible for SSI. (R. 43). On September 3, 2010, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant raises two issues:  (1) whether the ALJ properly applied the Eleventh Circuit's three-part pain standard, and (2) whether, in applying the pain standard, the ALJ improperly considered the objective medical evidence on the record by

(a) failing to properly consider the findings of Dr. Mohiuddin; and

(b) failing to properly consider the claimant's recent ankle injury, alone and in combination with claimant's back pain.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The

court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints under the Eleventh Circuit's pain standard, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart,* 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

In applying the pain standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Failure to articulate the reasons for discrediting the claimant's subjective complaints of pain requires that the testimony be accepted as true. *Id.* Even if this court disagrees with the Commissioner's decision, it must affirm the Commissioner's decision if substantial evidence supports it. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11 th Cir. 2004).

When evaluating medical evidence, "the testimony of a *treating* physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary. A *treating* physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Crawford*, 363 F.3d 1155, 1159 (emphasis added) (citation and internal quotation omitted). A doctor who examines a claimant on only one occasion does not qualify as a "treating physician," and his opinion is not entitled to great weight. 363 F.3d at 1160 (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)).

Evidence submitted for the first time to the Appeals Council becomes part of the

4

administrative record. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1067 (11th Cir.

1994). If a claimant challenges both the ALJ's decision to deny benefits and the Appeals

Council's decision to deny review based on the new evidence, then the court will consider

whether the new evidence would cause the denial of benefits to be in error. *Ingram v. Comm'r*,

496 F.3d 1253,1262,1265-66 (11th Cir. 2007). However, if the claimant only challenges the

ALJ's decision to deny benefits and not the Appeals Council's denial of review based on that new

evidence, then the court will not consider the new evidence submitted to the Appeal Council.

*Falge v. Apfel*, 150 F.3d 1320, 1323-24 (11th Cir. 1998).

### V. FACTS

The claimant has a high school education and, despite conflicting reports of her age in the

record, was forty-four years old at the time of the hearing before the ALJ. (R. 42, 153, 167-68,

171). At that hearing, a vocational expert classified the claimant's past relevant work experience

as both a restaurant cook, performed at a medium exertional level and skilled in nature, and as a

short order cook, performed at a light exertional level and semi-skilled in nature. (R. 29, 122,

143).

The claimant originally alleged she was unable to work beginning on May 1, 2000

because of mental illness and chronic back pain, which she testified began after falling down a

set of stairs several years earlier. (R. 22, 39, 46, 131-32). Dr. Aileen McAlister administered a

Psychiatric Review Technique on June 22, 2008 and noted no medically determinable

impairment; the claimant did not subsequently raise the issue of mental illness at the hearing

before the ALJ. (R. 13-33, 179, 191). The claimant revised the alleged onset date of disability as

a result of chronic back pain from May 1, 2000 to November 6, 2008 at the hearing, and she

5

testified there that her back pain had become excruciating approximately two to three years earlier. (R. 15, 39).  Furthermore, the claimant testified before the ALJ that she sustained an ankle injury after being hit on the head and falling in June, 2009. ( R. 25-26). The record reflects that she underwent a surgical procedure to repair a left ankle fracture on June 17, 2009. (R. 26-28, 41, 260).

*Physical Limitations*

On November 18, 2001, the claimant appeared at the Coosa Valley Baptist Medical Center emergency room and complained of moderate chronic lower back pain. (R. 213). She claimed the pain began after falling down a set of  stairs one-and-a-half years earlier; however, the claimant later testified this incident occurred in 1991. (R. 22, 213). X-rays revealed well-maintained vertebral body heights and disc spaces, but with slight rotary scoliosis, which Dr. Nina Terry classified as mild. (R. 216).

On July 12, 2008, the claimant appeared for a Disability Determination Service (DDS) consultative examination by Dr. Vijay Francis. (R. 170-174). She complained of both lower back and bilateral leg pain. She stated that her back pain had progressively worsened since falling down the stairs, and she reported a 10/10 pain level all of the time. Additionally, she stated her back pain radiated at times to both lower extremities, but more frequently on the left, and she reported weakness and numbness in the left leg. (R. 171).

After performing a thorough physical examination, Dr. Francis diagnosed chronic lower back pain, etiology unclear, with a differential diagnosis of degenerative disc disease, facet arthropathy, or myofascial pain syndrome. He noted that additional imaging may be helpful to determine etiology. As to the claimant's left leg weakness and numbness, Dr. Francis noted that

the sensory deficits did not correlate with a specific dermatomal[1] distribution. He stated that the weakness did not fit a specific myotomal[2] pattern and was unlikely secondary to radiculopathy. Dr. Francis reported a diminished range of motion of the cervical and dorsolumbar spine, but he commented that the results of the lumbar range of motion examination may have been secondary to poor participation.  He recorded a negative Spurling's maneuver, negative straight leg raise test, and negative Patrick's maneuver bilaterally. Dr. Francis's neurological examination of the lower extremities revealed break away weakness, which he also noted may have been secondary to poor effort in all major muscle groups tested. Lastly, he observed that the claimant could transfer onto and off the examination table and ambulate independently without any assistive device. (R. 172-73, 178).

On July 17, 2008, Dr. Mark Goddard, a DDS consulting radiologist, interpreted a radiologic examination of the claimant's lumbar spine and noted mild disc space narrowing at the L3-L4 level, but no fracture or spondylolistheses. (R. 176).  Dr. Robert Heilpern, a reviewing physician at DDS, incorporated the findings of Dr. Francis and Dr. Goddard into the claimant's Physical Residual Functional Capacity Assessment ("PRFCA"), dated July 24, 2008. (R. 194, 196, 201).  The PRFCA noted that claimant could occasionally lift fifty pounds, could frequently lift twenty-five pounds, and could either sit, stand, or walk with normal breaks for about six hours in an eight hour work day; and claimant's postural limitations only prohibited climbing a ladder, rope, or scaffolds. (R. 195-96, 201). The PRFCA noted that claimant's allegations were inconsistent with the objective medical findings and reported that no treating or examining

---

[1] A dermatome is an area of skin served by a specific nerve root.

[2] A myotome is an area of muscles served by a specific nerve root.

source made a statement regarding claimant's physical capacities. (R. 199-200).

On November 6, 2008, the claimant appeared at Childersburg Primary Care ("CPC") to obtain a pap smear. She also noted aching in the lower left extremity, ongoing for approximately four years, swelling, and intermittent pain from a past injury. (R. 223). The treating physician at the clinic, Dr. Speer, diagnosed chronic leg pain, but found nothing abnormal on the examination, although he mentioned an old fracture site. (R. 22, 223). On December 12, 2008, the claimant returned to CPC complaining of a broken finger (R. 222). (The claimant testified at the hearing before the ALJ that her leg gave out from time to time, and that her finger injury resulted from a fall on one such occasion. (R. 23).)  On January 19, 2009, the claimant again appeared at CPC and complained of chronic lower lumbar back pain, intermittent pain when she sat or stood too long, and radiating pain in the left leg. She classified this pain as 7 to 9 out of 10, present for months, and stated she was diagnosed with bone spurs in the past.   Dr. Speer noted a full range of motion in the lower lumbar and a normal gait. He prescribed Ultram for pain and referred the claimant to an orthopedic specialist. (R. 221).

On February 11, 2009, the claimant appeared at Coosa Valley Medical Center, where Dr. Mohammed Mohiuddin, an anaesthesiologist, examined her on referral from Dr. Speer. (R. 225). He noted the claimant's description of lower back pain radiating into the left leg as progressively worsening in the "History of Present Illness" section of his report, and he described the chief complaint as lumbrosacral neuritis, not otherwise specified. (R. 225, 228). Dr. Mohiuddin indicated that an MRI revealed disc herniation at L3-4, but no other medical documentation of the MRI exists in the record. (R. 24, 225). He further noted in the "Physical Examination" section of his report that claimant had a slightly limping gait, that straight leg raising tests were

positive on both sides, and that severe tenderness existed in claimant's lumbosacral area on the left side. Dr. Mohiuddin diagnosed the claimant with lumbar radiculopathy and recommended a lumbar epidural steroid block, which he administered that day. The discharge instructions advised claimant to "stay at home and take rest, and to use extreme precaution in walking as she may be weak from the medicine." (R. 225-26). On March 4, 2009, the claimant returned to CPC complaining of back pain. Dr. Speer described the claimant as having stiff movement, diagnosed back pain, and prescribed what appears to be Loritab and Ultram. (R. 220).

On June 14, 2009, the claimant appeared at Coosa Valley Medical Center complaining of ankle and head injuries, which she claimed occurred after she was hit over the head and fell. (R. 235). The attending physician, Dr. Kelley, diagnosed a scalp laceration and a severe left ankle fracture. (R. 236). The claimant tested positive for cocaine. (R. 249). A CT scan of the head showed no acute intracranial abnormality. (R. 244). On June 17, 2009, Dr. Scott Appell performed an Open Reduction Internal Fixation surgical procedure to repair claimant's left ankle fracture at Brookwood Medical Center. The intake form listed Tramadol, Ibuprofen, Loritab, and Percocet as claimant's medications. (R. 259-60). Either Dr. Kelly or Dr. Speer at Coosa Valley Medical Center prescribed Oxycodone for pain subsequent to the surgery. (R. 21, 251, 253).

*The ALJ Hearing*

After the Commissioner denied the claimant's initial applications for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 39). At the August 17, 2009 hearing, the ALJ asked the claimant why she thought she was disabled, and the claimant testified that she had terrible, excruciating back pain, which had become disabling two to three years earlier. Her counsel argued that her disability was based

on degenerative disc disease of the lumbar spine at L3-L4, scoliosis, and a history of left ankle fracture, which the claimant testified occurred in June, 2009. (R. 15).

Claimant's counsel initially altered the  alleged onset date from May 1, 2000 to June 1, 2006,  just prior to the claimant's last insured date of June 30, 2006 for DIB. *Id.* After reviewing the dates of the medical records in evidence, the ALJ suggested that insufficient evidence existed to support a finding of disability going back to 2006, 2007, or most of 2008 because of the lack of primary care records supporting a longitudinal treatment history. (R. 18). The claimant agreed to amend the alleged onset date to November 6, 2008, the first date of her treatment at CPC. (R. 19). Because the amended date fell after the claimant's last insured date, the ALJ suggested that finding the claimant eligible for her DIB claim was not possible; therefore, the claimant agreed to drop the request for hearing as it related to her Title II DIB claim and proceed only with the Title XVI SSI claim. (R. 19-20).

The claimant testified that she received one epidural steroid block for pain, but refused to undergo any more because "[i]t wasn't doing any good." She claimed to receive a letter from a doctor saying she was "diagnosed with lumbago, and there was nothing else that they could do for me." The ALJ noted that Dr. Speer prescribed Ibuprofen, Hydrocodone, and Tramadol to the claimant in December, 2008, and the claimant testified that he subsequently prescribed Oxycodone. (R. 20-21).

Next, the ALJ asked claimant whether she injured her lower left extremity in the past, and the claimant testified that she sustained the injury after falling down some steps at truck driving school in 1991. She stated that she did not go to the doctor at first because "it felt like it was getting better[,]" but worsened as she grew older. (R. 22). The ALJ reviewed the records from

CPC and asked the claimant if she saw an orthopedic specialist after being referred to one on

January 19, 2009. The claimant responded, "No, sir. I don't think - - well, yes I did - - I can't

remember." (R. 23). Claimant's counsel then mentioned the claimant's visit with Dr. Mohiuddin

and indicated the MRI result reflecting disc herniation at L3-4. The ALJ asked the claimant if she

had the MRI that day in Dr. Mohiuddin's office, and the claimant responded that Dr. Mohiuddin

did not perform the MRI; rather, she testified the MRI occurred approximately two days earlier in

another office. The ALJ and claimant's counsel acknowledged the absence of the actual MRI

records, but the ALJ assumed Dr. Mohiuddin's statements regarding the results of the MRI were

correct. (R. 24). The ALJ then asked claimant about Dr. Mohiuddin's examination regarding the

positive straight leg test results, and she responded that Dr. Mohiuddin did not conduct such a

test. (R. 25).

Next, the ALJ reviewed the records regarding claimant's ankle injury, and the claimant

testified that she was "messing around, playing" and "swinging" with some friends in a parking

lot, where, after being hit in the head with a stick, she fell, hit her head on the corner of a table,

and sustained both a scalp laceration and fractured left ankle as a result. The claimant testified

that she had a CT scan of the head and ankle surgery, and reported that she had been using a cane

following the surgery. The ALJ noted the presence of cocaine in the claimant's system on the day

of the injury, as reflected by the medical records. He further acknowledged the records of the

follow-up treatment for the ankle injury on June 28, 2009. (R. 26-28).

The ALJ proceeded to interview the vocational expert, Mr. Johnny Lumm, Jr.. When

asked about the claimant's work history for the last fifteen years, the VE stated: "She had work

as a restaurant cook, and Social Security . . . had it listed as short order cook. So a cook is

11

medium skilled work, and a short order cook is light semiskilled work." The ALJ reviewed the earnings reports and determined that none of the amounts qualified as substantial gainful employment. The ALJ asked the VE whether, hypothesizing a person of claimant's age, education, and work history who could perform light work, such a person could perform any work in the national economy. The VE responded affirmatively, stating that as many as 6,000 cashier jobs and 3,000 assembly jobs existed in North Alabama and were available to such a person. (R. 29-30).

The ALJ asked the claimant whether her most significant pain was in her back or ankle, and claimant responded that it was in her back. When asked to rate her pain level on a scale of one to ten, the claimant responded, "Today it would be like about an eight-and-a-half." When the ALJ asked her about a normal day's pain level, the claimant responded, "about an eight, seven-and-a-half to eight." The ALJ then asked about the medications claimant took, and the claimant stated she was taking Hydrocodone and Ibuprofen that day, that she tried not to mix the Hydrocodone and Tramadol, and that she had been taking these medications since they were prescribed in December of 2008. The claimant stated that the medications relieve the pain "from time to time . . . [b]ut it still aches and hurts." Lastly, the ALJ asked about claimant's pain level after taking the medications, and the claimant responded, "I'd say about a seven, still seven." Returning to the VE, the ALJ asked,  "[A]ssume a person of Ms. Buford's age, education and work history who suffers from moderately severe pain of the sort she just described.  Would that preclude all work in the national economy?" The VE replied that it would. (R. 31-32).

*The ALJ's Decision*

On October 22, 2009, the ALJ issued a decision dismissing the claimant's hearing request

12

for her Title II DIB application, he found, as to the Title XVI SSI application, that claimant was not disabled under the Social Security Act. (R. 43). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of her disability. Next, the ALJ found that "claimant has the following severe impairment: chronic back pain secondary to possible degenerative disc disease and status post left ankle fracture." Third, the ALJ noted that claimant did not allege that she had an impairment or combination of impairments that  met or equaled an impairment in the Listing of Impairments, and the ALJ concluded that claimant did not. (R. 40).

The ALJ next considered the claimant's subjective allegations of pain in order to determine her residual functional capacity. The ALJ found the claimant had "the residual functional capacity to perform light work as defined in § 967(b) with a sit/stand work option and no more than mild-to-moderate pain."  He stated, "I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . . I have also considered opinion evidence in accordance with the requirements . . . ." In making this determination, the ALJ articulated the current Eleventh Circuit pain standard test and proceeded to consider claimant's testimony regarding (1) her inability to work due to chronic back pain, which she testified became disabling two years earlier; (2) the single lumbar epidural block and Oxycode prescription claimant received for pain; (3) the MRI of claimant's lumbar spine showing disc herniation at L3-4; and (4) the surgical repair of claimant's fractured left ankle. Based on this evidence, the ALJ concluded that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of

those symptoms are not credible to the extent they are inconsistent with the . . . residual

functional capacity assessment." (R. 40-41).

To support this conclusion, the ALJ referenced the objective medical evidence on file. He

noted the claimant's treatment at the emergency room in 2001 for chronic lower back pain,

during which X-rays revealed mild scoliosis. He referenced the consultative examination

performed on June 12, 2008, and noted Dr. Francis's findings that (1) claimant was able to get on

and off the exam table without difficulty; (2) claimant ambulated without any assistive devices;

(3) claimant had decreased range of motion in her lumbar and cervical spine, but that, in Dr.

Francis's opinion, this result may have been secondary to poor participation; (4) claimant had

negative straight leg raising, negative Spurling, and negative Patrick maneuvers; and (5) claimant

had full major muscle strength throughout and full grip strength. The ALJ further observed Dr.

Francis's diagnosis of chronic low back pain, etiology unclear, with left leg weakness and

numbness, and he cited the results of the lumbar spine X-rays, which showed no fracture or

spondylolistheses and only mild disc space narrowing at L3-4. (R. 41).

Continuing his review of the medical records in evidence, the ALJ noted claimant's

further treatment for chronic lower back pain from August, 2008 until the time of the hearing.

He observed Dr. Mohiuddin's February 2009 diagnosis of lumbar radiculopathy, listed the

subsequent performance of a lumbar epidural steroid block, and acknowledged Dr. Mohiuddin's

notation of an MRI showing disc herniation at L3-4. Finally, the ALJ discussed the emergency

room treatment claimant received on June 14, 2009 after being hit on the head, falling, and

twisting her ankle; he noted that claimant tested positive for cocaine. The ALJ recounted the CT

scan of the claimant's head revealing no acute abnormality and the surgical repair claimant

underwent to repair her left ankle. (R. 41-42).

After this review, the ALJ found the claimant's testimony was "not consistent with the medical evidence or with the opinions of the medical treating and consulting sources." (R. 42) He observed that "[r]epeated examinations found no evidence to support the claimant's allegations of pain[,]" that she "did not see a doctor on a regular basis[,]" and that she "has not had any surgery for her alleged back pain, nor ha[d] any been recommended." The ALJ emphasized that claimant had only one lumbar epidural steroid block for pain and that X-rays showed no fracture or spondylolisthesis and only mild disc space narrowing at L3-4; however, he acknowledged that Dr. Mohiuddin indicated an MRI showed a disc herniation at L3-4. The ALJ further stated that no treating or consulting source indicated claimant could not function independently or perform at least some type of work at a light level of physical exertion and announced he had given significant weight to the reviewing sources at the Disability Determination Service in July 2008. Lastly, in describing claimant's residual functional capacity, he asserted that, "[a]lthough the claimant's reports of her daily activities, pain, functional limitations, etc. are generally consistent with her severe impairments, they are not consistent with the overall objective evidence" and that "with some minor restrictions[,]" claimant "is capable of functioning independently and being able to perform simple light work." (R. 42).

Next, the ALJ considered claimant's past relevant work as a cook. He cited the vocational expert's testimony that a cook was a semi-skilled position and involved medium physical exertion. Having found that claimant was limited to a light level of physical exertion, the ALJ concluded claimant was unable to perform any past relevant work. The ALJ then proceeded to consider whether, based on claimant's age, education, work experience, and

15

residual functional capacity, any jobs existed in significant numbers in the national economy that claimant could perform. The ALJ noted that claimant's ability to perform all light work had been impeded by additional limitations. He recounted the vocational expert's testimony that over 8,000 cashier and assembly jobs existed in north Alabama available for an individual with claimant's age, education, work experience, and residual functional capacity.  As such, the ALJ concluded that claimant was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and, therefore, was not disabled under the Social Security Act for the purposes of her Title XVI SSI application. (R. 42-43).

### Treatment Records Subsequent to the ALJ Hearing

After the hearing before the ALJ, the claimant received rehabilitative treatment for her ankle injury at Coosa Valley Regional Center beginning on September 16, 2009 and ending December 3, 2009. (R. 264-274). Claimant submitted these records to the Appeals Council on July 28, 2010, and they became part of the record after the ALJ's decision of October 22, 2009. (R. 5, 10, 168). On September 17, 2009, Dr. Appell signed a record, which indicated that claimant's back pain was directly related to her ankle fracture and that the fall exacerbated her lower back pain. (R. 264). A rehabilitation evaluation certification for the period from September 16, 2009 to October 16, 2009 indicated that an X-ray performed on claimant's back revealed degenerative joint disease. (R. 265). On October 2, 2009, the claimant reported that her ankle felt much better, though she subsequently reported soreness in her ankle on October 16, 2009. (R. 269-270).

## VI. DISCUSSION

First, the claimant argues that the ALJ improperly applied the Eleventh Circuit's three-

16

part pain standard. Second, she argues that substantial evidence does not support the ALJ's decision because he improperly considered the objective medical evidence in the record by (a) failing to properly consider the findings of "treating" physician, Dr. Mohiuddin; and (b) failing to properly consider the claimant's ankle injury, alone and in combination with claimant's back pain. For the reasons stated below, this court disagrees with claimant's contentions.

### 1. The ALJ Properly Applied the Eleventh Circuit Pain Standard

The claimant first argues that the ALJ improperly applied the Eleventh Circuit's three-part pain standard. The three-part pain standard applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." 921 F.2d at 1223 (emphasis added). A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Foote v. Chater,* 67 F.3d 1553, 1561 (11th Cir. 1995). If the claimant establishes that she has a medical condition that could reasonably be expected to produce her alleged symptoms, then the ALJ must evaluate evidence of the intensity and persistence of the alleged symptoms and their effect on claimant's ability to work. *Foote,* 67 F.3d at 1561*; see also* 20 C.F.R. §416.929 (c)(1).

In applying the three-part standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Failure to articulate the reasons for discrediting

the claimant's subjective complaints of pain requires that the testimony be accepted as true. *Id.*

Here, the ALJ properly articulated and applied the Eleventh Circuit pain standard in his decision. He found that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (R. 41). As noted above, the ALJ articulated his reasons for discrediting claimant's subjective testimony. He specifically stated that (1) repeated examinations found no evidence to support the claimant's allegations of pain; (2) she did not see a doctor on a regular basis; (3) she had not had any surgery for her alleged back pain, nor had any doctor recommended it; (4) she had only one lumbar epidural steroid block for pain; (5) X-rays showed no fracture or spondylolisthesis and only mild disc space narrowing at L3-4, although an MRI showed disc herniation at L3-4; and (6) no treating or consulting source indicated claimant could not function independently or perform at least some type of work at a light level of physical exertion.  Therefore, the ALJ properly applied the Eleventh Circuit pain standard and stated the reasons for which he discredited claimant's subjective testimony. As will be shown below, substantial evidence supports the ALJ's decision in its entirety.

### 2. The ALJ Properly Considered the Medical Evidence in the Record and Substantial Evidence Supports His Decision

Second, claimant argues that substantial evidence does not support the ALJ's decision because he improperly considered the objective medical evidence in the record by (a) failing to properly consider the findings of "treating" physician, Dr. Mohiuddin; and (b) failing to properly

18

consider the claimant's ankle injury, alone and in combination with claimant's back pain. The court addresses these arguments in turn below.

Under a limited standard of review, this court will not decide the facts anew, make credibility determinations, or re-weigh the evidence. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Even if this court disagrees with the Commissioner's decision, it must affirm the Commissioner's decision if substantial evidence supports it. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11 th Cir. 2004).

### A. The ALJ Properly Considered the Findings of Dr. Mohiuddin

Claimant asserts that "the records of the consultative examiner Francis . . .[indicating a decreased range of motion in the lumbar and cervical spine] are consistent with those of 'treating' physician Dr. Mohiuddin[,] who diagnosed lumbar radiculopathy with left leg weakness and positive straight leg raise test on both sides in February 2009." (Pl.'s Br. 8). Claimant further argues that the ALJ "dismissed the treating records of physician Mohiuddin, including the MRI result of disc herniation at L3-4, with the simple statement that no treating or consulting source had indicated that the . . .[claimant] was not 'able of functioning independently or performing at least some type of work at a light level of physical exertion.'" (Pl.'s Br. 7-8) (emphasis added). Because of the MRI evidence of disc herniation, noted positive straight leg raise tests, epidural steroid block, and medication prescribed for pain, claimant asserts that enough evidence exists in the record to result in a decision favorable to her. (Pl.'s Br. 9). Thus, the claimant generally argues that the ALJ did not properly consider the findings of Dr. Mohiuddin as a "treating physician." The court disagrees.

In July, 2008, Dr. Francis's consulting examination of claimant and supporting X-ray results revealed only mild disc space narrowing, no fracture or spondylolisthesis, and negative straight leg

raising, Spurling, and Patrick maneuvers.  Dr. Francis found a diminished lumbar range of motion, but noted it may be secondary to poor participation. He further observed lower extremity break away weakness following a neurological examination, which he also noted may be secondary to poor effort. Dr Francis diagnosed chronic back pain, etiology unclear, with a differential diagnosis of possible degenerative disc disease, facet arthropathy, or myofascial pain syndrome.

In February, 2009, Dr. Mohiuddin noted an MRI result indicating disc herniation at L3-4. At the hearing, the ALJ accepted the MRI disc herniation result, although the documentation of that test result was not present in the record. Dr. Mohiuddin made no specific findings as to claimant's lumbar range of motion, yet he noted that she had a slightly limping gait, positive straight leg test results on both sides, and severe tenderness in the lumbosacral area on the left side. Dr. Mohiuddin diagnosed claimant with lumbar radiculopathy and, claimant asserts, left leg weakness; however, Dr. Mohiuddin did not specifically diagnose left leg weakness or document any examination results regarding claimant's leg. He merely noted in the "History of Present Illness" section of his report that claimant's back pain had radiated into the left leg and had progressively worsened prior to the epidural procedure.

Although both claimant and the Commissioner refer to Dr. Mohiuddin as a "treating" physician in their briefs, the ALJ did not specifically categorize him as such in his decision.  Thus, the court must first determine whether Dr. Mohiuddin is a "treating" physician whose testimony is entitled to substantial weight. "It is well-established that the testimony of a *treating* physician must be given substantial or considerable weight unless good cause is shown to the contrary. A *treating* physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004) (emphasis

added) (citations and internal quotations omitted). A doctor who examines a claimant on only one occasion does qualify as a "treating physician," and his opinion is not entitled to great weight. *Crawford*, 363 F.3d 1155 at 1160 (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) As explained in the regulations, a "[t]reating source means your own physician . . . or other acceptable medical source who provides you . . . with medical treatment . . . and who has, or has had, an *ongoing treatment relationship* . . .." 20 C.F.R. 404.1502. (Emphasis added).

In the instant case, no ongoing treatment relationship existed between claimant and Dr. Mohiuddin.  The record reflects that claimant visited Dr. Mohiuddin only once on February 22, 2009. Therefore, the court finds that Dr. Mohiuddin does not qualify as claimant's "treating" physician.

As a  non-treating, examining physician, Dr. Mohiuddin's  findings carried no superior weight over those of consulting examiner Dr. Francis. To the extent that claimant argues the findings of these two doctors were consistent, the court recognizes that the records of Dr. Mohiuddin, specifically the disc herniation MRI and positive straight leg results, do provide some objective medical evidence to support claimant's allegations of back pain, which she stated had become excruciating and disabling two to three years prior to the hearing. (R. 15). Dr. Francis's findings of diminished range of motion in the lumbar and cervical areas of the spine provide objective medical evidence as well, despite Dr. Francis's notation that the lumbar range of motion may be secondary to poor participation by the claimant.

However, those records, while representing objective medical evidence to support the existence of *some* pain, do not necessarily support claimant's testimony about the *extent* of her pain, which is the key determination. Given that the ALJ applied the correct Eleventh Circuit pain standard, this court will not re-weigh evidence nor decide the facts anew, but will only consider

whether substantial evidence supports the ALJ's decision.  In his decision, the ALJ acknowledged the major findings of both Dr. Francis and Dr. Mohiuddin. He noted Dr. Mohiuddin's discussion of the MRI disc herniation result, despite the absence of that actual test result in the record, and acknowledged the diagnosis of lumbar radiculopathy.  Although the ALJ did not specifically address the differences in the straight leg test results between the two doctors in his decision, which occurred approximately eight months apart, the court notes that when asked about Dr. Mohiuddin's positive straight leg test results at the hearing, claimant testified that Dr. Mohiuddin did not conduct such a test. (R. 25).

Even if the findings are consistent, as claimant suggests, the ALJ rested his decision on claimant's residual functional capacity (RFC) and on the vocational expert's testimony that jobs existed in significant numbers in the national economy that an individual with claimant's age, education, work experience, and RFC could perform. Most notably, the ALJ stated that "no treating or consulting source indicated that the claimant is not able of functioning independently or not capable of performing at least some type of work at a light level of physical exertion." (R. 42).  As the Commissioner points out in his brief, the functional limitations of a condition determine disability, not the mere diagnosis of that condition. (Comm'r's Br. 7); see *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11 th Cir. 2005) (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir.1986)) ("[T]he mere existence of these impairments does not reveal the extent to which they limit . . .[claimant's] ability to work or undermine the ALJ's determination in that regard."); *see also McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) ("'[S]everity' of a medically ascertained disability must be measured in terms of its effect upon ability to work.").  As discussed below, neither Dr. Francis nor Dr. Mohiuddin specifically articulated the extent to which their findings and

diagnoses affected claimant's ability to function and perform work-related activities.

The ALJ  stated that he gave significant weight to the reviewing sources at DDS, who assessed the claimant's physical limitations and incorporated these findings into the claimant's Physical Residual Functional Capacity Assessment. The PRFCA noted that claimant could occasionally lift fifty pounds, could frequently lift twenty-five pounds, and could either sit, stand, or walk for about six hours in a work day.[3] That assessment also accepted and incorporated the examination results of Dr. Francis, who did not specifically determine claimant's physical capacities, except to note that she could ambulate independently without an assistive device. The PRFCA accurately indicated that no treating or examining source made a statement regarding claimant's physical capacities. (R. 196, 200).

Similarly, nothing in the record of claimant's visit to Dr. Mohiuddin describes how his diagnosis of lumbar radiculopathy, the disc herniation reflected in the MRI, or the positive straight leg raise test bear on what work-related actions claimant can perform despite these symptoms or impairments, nor do they describe in detail any significant physical limitations. Following the lumbar epidural block procedure, the discharge instructions advised claimant to "stay at home and take rest, and to use extreme precaution in walking as she may be weak from the medicine."  This advice, however, says nothing about claimant's ability to function after she recovered from the procedure. Dr. Mohiuddin also noted that claimant had a slightly limping gait. This observation, while somewhat descriptive, does not indicate with sufficient clarity Dr. Mohiuddin's assessment of claimant's work-related limitations.

---

[3] The court notes, however that, the ALJ's RFC assessment limited claimant's ability to work to the light exertional range, which category represents the ability to lift only 25 pounds occasionally and 10 pounds frequently, thus benefitting the claimant.

Here, the ALJ properly compared the findings of two examining physicians and noted that none of these records precluded a finding that claimant could perform at least light work, nor demonstrated the level of disabling pain claimant alleged. Thus, the ALJ justifiably gave significant weight to the only records demonstrating claimant's work-related physical capacities as a result of her condition, the reviewing DDS sources. In further support of the ALJ's decision, Dr. Speer, who, based on the frequency of claimant's visits, qualifies as a treating physician, found nothing abnormal upon examination in November of 2008 and, in January of 2009, he indicated claimant had a full lumbar range of motion and normal gait. (R. 22, 220-23). As such, because Dr. Mohiuddin was not a treating physician and substantial evidence exists in the record to support the ALJ's assessment of claimant's residual functional capacity, this court finds that the ALJ properly considered the findings of Dr. Mohiuddin.

### C. The ALJ Properly Considered the Pain from Claimant's Ankle Injury

Finally, claimant asserts that although the ALJ found claimant's "status post left ankle fracture to be a severe impairment, the ALJ made mention of this impairment only once in passing" by noting "that she fractured her left ankle and underwent surgical repair in June 2009." The claimant argues that the "ALJ cited the June 17, 2009 surgery to repair a trimalleolar fracture on the left, yet failed to determine what if any limitation might be placed on the . . .[claimant] due to the ankle fracture." Furthermore, claimant asserts that the "rehabilitation notes clearly indicate that her left ankle fracture has complicated and contributed to her chronic back pain[,]" and she argues that the "ALJ should therefore have properly considered the ankle pain, and the ankle injury in combination with the . . . [claimant's] alleged back pain." (Pl.'s Br. 8-9).

While both claimant's and the Commissioner's briefs treat the claimant's ankle injury as

a distinct impairment, the ALJ concluded in step two that "claimant has the following severe *impairment*: chronic back pain secondary to possible degenerative disc disease and status post left ankle fracture." The ALJ went on to find that "claimant's medically determinable *impairment* could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual function capacity assessment." (R. 40-41) (emphasis added). Although the ALJ refers to the claimant's "impairment*s*" in other parts of his decision, these references could well be typographical errors. In any event, the record reflects that the ankle injury occurred only two months before the hearing date. Nothing in the medical testimony before the ALJ suggested that claimant's ankle injury alone could reasonably be expected to last twelve months. Claimant testified at the hearing that her back was the primary source of pain. Thus, substantial evidence supports a determination by the ALJ that claimant's ankle injury was not a functional limitation that had lasted or could reasonably be expected to last at least twelve months or result in death, as required under step two of the five step analysis. *See* 20 C.F.R. 404.1520(a)(4)(ii); 20 C.F.R. 404.1509. Therefore, the ALJ properly did not consider the ankle injury as a separate severe impairment; he need only have considered the ankle injury as it pertained to claimant's back pain in the residual functional analysis assessment.

Assuming, arguendo, that the ALJ's decision could be read to list the status post left ankle fracture as a separate severe impairment at step two of the ALJ's analysis, still nothing in the medical records of that injury before the ALJ demonstrated how that injury, alone or in combination with claimant's back pain, imposed any long term disabling limitations on claimant. The ALJ acknowledged that claimant had fallen two months before the decision, that she had

surgery on her ankle thereafter, and he referred to the medical records on file for her ankle injury in his decision and RFC assessment.

Rehabilitation records, which claimant submitted to the Appeals Council in July 2010 after the ALJ hearing on August 17, 2009 and decision on October 22, 2009, demonstrated that claimant's fall and ankle injury may have exacerbated her back pain, but these records were not before the ALJ. Evidence submitted for the first time to the Appeals Council becomes part of the administrative record. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1067 (11th Cir. 1994). If claimant challenges both the ALJ's decision to deny benefits and the Appeals Council's decision to deny review based on the new evidence, then the court will consider whether the new evidence would cause the denial of benefits to be in error. *Ingram v. Comm'r*, 496 F.3d 1253,1262,1265-66 (11th Cir. 2007). However, if the claimant only challenges the ALJ's decision to deny benefits and not the Appeals Council's denial of review based on that new evidence, then the court will not consider the new evidence submitted to the Appeals Council. *See Falge v. Apfel*, 150 F.3d 1320, 1323-24 (11th Cir. 1998).

Here, claimant's brief on appeal references the subsequent rehabilitation notes, but only argues that the *ALJ* should have examined claimant's ankle pain more closely. (Pl.'s Br. 9:5-10). At most, claimant makes only a passing reference to the Appeals Council's decision to deny review. (Pl.'s Br. 2:15-3:2). A passing reference is not sufficient to preserve an argument for review. *See Rowe v. Schreiber*, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998) (explaining that an issue may be deemed abandoned where a party only mentions it in passing, without providing substantive argument in support).

Because claimant did not challenge the Appeals Council's denial of review on appeal, this

court will only review the evidence that was submitted to the ALJ.  *See Falge*, 150 F.3d at 1323-24. As such, those records submitted after the ALJ's decision, which demonstrate a possible connection between claimant's ankle injury and back pain, indicate weakness, numbness, and tingling in the lower left extremity, and report an X-ray result showing degenerative joint disease, can be of no avail to claimant. Given the record before the ALJ, he properly acknowledged claimant's chronic back pain as the primary severe impairment and rightly considered claimant's ankle injury as one possible cause of or contributing factor to her back pain, not as a separate impairment.

Under a limited standard of review, this court will not decide the facts anew, make credibility determinations, or re-weigh the evidence. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  As shown above, substantial evidence supports the ALJ's determination that claimant's back pain was not disabling because she had the residual functional capacity to perform light work, and evidence showed that specific jobs existed in significant numbers in the national economy that an individual with claimant's particular attributes and limitations could perform. As an alternative ruling, the court finds that the materials submitted to the Appeals Council would not cause the denial of benefits to be in error.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 1st day of August 2011.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

27